This case on the Dr. 270349. People would say, I need he respond. You. Thank you, sir. You know, justices. My name is Thomas. I have counsel for the appellant. And I suppose there's cases that say that every juvenile appeal from a termination of rights is kind of sui sponte because they're all terribly fact dependent. And this is certainly no different. We have a situation where on January, I think it's the 16th of 2017, the circuit court judge who was hearing the case, had a permanency hearing, polled the counsel who were there about whether or not the goal should be changed for the minor. And with two exceptions, counsel for the state's attorney's office and for the agencies involved said, returning to home within one year, the guardian of the item said, no, I think the adoption should go forth. It's been a long time. And the judge says I'm overruling the other counsels and I'm changing the goal. And the question is, how did we get there? That was the first time that the trial court found no reasonable efforts, correct? I think so. Yes. There was one question about, early on about one issue that he might've said, you know, I'm not sure, but by and large, by the time we got to that point where the change of goal happened, everybody agreed. And I think the court fully agreed that my client had done everything humanly possible to comply with the, you know, the service plan. What date are you saying that was? The change of goal? January 26th. It's got a six in it. January 26th. Okay. All right. Thank you. And two or three things that are really important about that. My client had been in DOC before anything factual happened in this case. So it's not like he was the person who did anything to cause the findings initially by the court. He was just, couldn't go, he was locked up. He was given a service plan consistent with the ruling of this court in the Keon case. He did everything which was possible within the confines of the Department of Corrections to comply with it. I have some, a fair number of quotations from the record simply because the court discussing with my client that, yes, I understand things such as, I understand that you've done all you can do, maybe you can transfer from Jacksonville to someplace else, but I can't release a child to DOC so you're not making reasonable progress and frankly, this court, this court being the trial court, honestly believes or believed that incarceration all by itself meant reasonable progress is impossible. And that's just, all's going to be okay. Well, reasonable progress is, is determined in the case law by measurable or demonstrable movement toward the goal of return home. Absolutely. Did we have it here during that nine month period? I believe we did. And I think the difference in definition, the question of definition is on the one hand, and I think the trial court believes this hand, the reasonable progress has to be for return of the child within the nine month period. Now, the law doesn't say that, but I think that's consistent with the way the whole thing has grown up and the way this, and it's not technically a companion case, but the Ramos case decided by another panel of this court on the 14th of August. I think went a long way toward answering that. There was, I don't know if everybody's familiar with the opinion in Ramos. It's 217-229. Okay. So to the extent there was a pending question as to whether or not incarceration alone is enough to find unfitness. The opinion in Ramos says, specifically in one sentence, and I've got the opinion with me, I'm glad to read it to you, says that is not the law. And then what, and it affirmed on other grounds, but the opinion is very clear. And frankly, it's not an opinion, it's an order under rule 23. And there's a pending motion from the prosecutor's office to publish it, which I agree with. Because while that is not new law, replace us, I submit that it is brand new law in Winnebago County. And it's one of the main reasons for this appeal is to frankly attack and bring that issue before this court. Ramos got called first, Ramos is against the opinion of the order that addressed it first. So we have an opinion or the order of this court from three weeks ago saying, well, the rule isn't that incarceration alone is enough. And I cite the Keon case just kind of obliquely for the fact that, you know, you've got a right to have a service plan. Do you agree that Keon is different because there was no service plan? Yeah, there's a lot of differences. Here there is a service plan. There is, there's a lot of differences between here, between Keon and here. And I fully understand that in many ways it's distinguishable, but in the most fundamental way, I submit it's not. If you have a right to a service plan, and I think that that's all I'm saying Keon for, you have a right for a service plan, you have a right to try. And the right to try includes a right to possibly succeed because if there's not at least an abstract possibility of success, the right is make-believe. You have to at least have the chance in a realistic way to comply with the service plan. And frankly, in this case, the court was very clear. I mean, he made specific findings, more specific than almost any judge I've ever seen in any opinion anyway. You cannot make reasonable progress. You can't do it because you're incarcerated. So he never gets to other issues. What about the defendant then? Isn't the failure to make a request for a transfer, failure to make reasonable progress? Couldn't the defendant have done that? Not on this record, no, no. The problem, one of the problems with this case that I fully recognize is because of the way it grew up, the record's not great. You have a person who's in prison doing everything that the DOC allows him to do. And nobody disputes that. Judge finds it's true. So if somebody were to make a record that says, pick a prison, you know, any prison, Dixon, and you say they have a class there in parenting, you have to know it. You have to have the ability to seek a transfer. You have to make the transfer request. If nothing else, that's got to be, I suggest, the burden of proof of the state to say that he didn't do it. Because if we put ourselves hypothetically in the position of the prison is prison, you don't get to come and go as you please. You don't have the access, which you always may have. And unless somebody makes an argument of finding an offer of proof, something in the record that says you haven't done everything you can, then it seems to me the burden of showing lack of reasonable progress cannot be, they can't be. Because you can't do things, you can't require things in a service plan, which are impossible, and then say, you can't do it. I understand this is a factually difficult case. And I want to go back to... Because what's difficult about it is because the impossibility was foisted upon the defendant or the respondent father, in this case, by himself, by becoming incarcerated. In a sense, that's true. And all that was pre-testing. Pre-events that led to... I can tell you two days ago, I found a statute, what I think is a new statute, subparagraph R in 50D1. This is subparagraph M, and it talks about this kind of case. And it puts a two-year limit on the incarceration time for finding... For being unable to fulfill your parental responsibility. So, I mean, there is a wall that has been put out there, a wall to run at, so to speak. If I understand the last statement correctly, I have a hard time seeing how that's different than the trial court's opinion here. You're in DOC, too bad. You're there because you're guilty of something. And clearly, in the overwhelming, about 99% or more, situations, you end up guilty of something to get there. The chances of liable conviction are real, but they're not numerous. And the overwhelming number of people are there, percentage are there, because they deserve to be there. I don't know anything about why he's there. There's no record about, in this case, about what happened before. But I do know that the record doesn't say anything that says he's there for a reason that makes him unfit all by himself. But everyone in this case knew he was going to get out in November of 16, right? I mean, that was before the trial court early on in his procedure. That was, I don't know what they call that as an expected parole date, or, you know, there's a term for it. And that everything else being equal, that there's a date when you're scheduled to be out. And yes, if not from the first day, from early on, everybody knew that. And I think it's important that this case, that everybody realize, this case is really backwards. I'm on the side of the DCFS. Who would have thought? I mean, that's not where I end up, but they are saying, no, don't change the goal. And I understand that Garvey didn't like him, I know him well, he means it. And he wants to have the adoption go through. And so he should have said, I object, I want the adoption to go through. But I think the right result for this is to say, go back to the 26th of January. And frankly, it says in, I quoted part of the record in a memorandum that my client's down west, I heard, in Champaign-Urbana, he's got a job, he's living with a lady by whom he had a child. If there is such a thing as kind of like the picture book, what you want the person getting out of prison to do, he's doing it. On this record, he's doing it. And if there's something more, certainly the state's free to show it if it gets remanded. But this, I suggested, is a classic situation where you've got somebody, and he doesn't appear, you know, for the last year. But the judge has already ruled no more unification services. And if you go back to the initial hearing in all of these cases, there's a judicial admonition as to that, if you don't make a reasonable progress, you can lose your children, da-da-da-da-da-da, and I don't have that in my documents here. But we know it's there because every case has it. And it's just a question of how it's phrased in any given case. I really think that the only way, I hate to say it this way, but to convince the Winnebago County system as a whole to follow the statute is to just forget this stuff about incarceration by itself being an automatic unfitness finding, because that's what it is there. I would request that you grant counsel's motion or whoever is on the panel or whoever rules on the statute to do something similar in this case, so, and you can reference the Newsom Paragraph R and say this is what we need to do. Do you have authority for the proposition that a trial court cannot find a parent failed to make reasonable progress on the sole basis that he or she's incarcerated during the entire nine-month period? Do I have that they can't? Yeah. No, and I have to say two things in response to that. First of all, I've never seen it come up. I've been doing this about a year, and as you may guess, I'm not the new law school graduate who's looking for their first job. I'm doing this as he's in retirement. So, you know, to get right down to it, I cannot give you a site that says a judge can't do that, and frankly, I'm a believer in judicial authority, and I think he probably can. Absent a statute that says, as a matter of manifest weight, if somebody's done everything they've been asked to do, everything that's possible, that's got to count for something, and in this record, it counts for nothing. And at the very least, I would ask that it be remanded to say, you know, please make a record of this, because right now, all we have is, I'm sorry, I told you that you couldn't possibly become anything other than a vet, so you shouldn't be surprised when I rule that way. I was stunned when I saw the KM decision, because for all the other things that it does, I said, this is the first time I've seen an opinion that says you have a right to try. You have a right to have a service contract, and that immediately said to me, sitting reading it the first time, this means that Winnebago County is wrong. It means the state's attorney is wrong, it means the defense counsel is wrong, it means that people have a right to try. And that's the guts, on a societal basis, that's my argument. And then, for an individual basis, well, you ought to get the right to try, too, and you ought to have somebody listen to the agency who says they're not trying to find an event, in order to file something to find an event. And then, when they file a motion that sets the outset date of October 16th, I think, but in October of 2016, and they're having a hearing, and Mike Reardon, the GAL, is questioning somebody, and he says, the answer starts to come out through his question, that it's post the period of time set forth in the petition that terminated. And there's an objection. The judge overrules the objection, or states overrule, and starts to say something, and the guardian ad litem says, no, that's a point well taken. I'll withdraw the question, which is exactly the right thing for the guardian ad litem to do. So, it was absolutely clear that the question of time limits, X date to X date, the nine months, was not something that was going to be considered. And I believe there's a reference, and I think it's in my memorandum of the appellate court's fame, something about February 2017. If we're going to have pleadings, because although a dual court is a unique court, it has to be, it's still a court, and you still have to have pleadings that say something, and you have to know what's being proven, and you have to know what's being defended against. And if you can't do that, we might as well just give up, and make a big social service agency, and not pretend. Mr. Laffer, just real quickly, because we're out of time, but is it possible that it could make a difference if we knew what he was incarcerated for, under the same facts that we're talking about here? Because you've kind of made a blanket statement, that just the fact that he's in VOC shouldn't be the criteria. Would it make a difference if we knew what it was for? Let me refer you to the Keogh decision, where that was an issue, and they went at great length, and frankly, I don't remember who was on the panel, but they talked about that, because the stated reasons for not giving him a plan was the sexual nature of his crime. And the court really spent a fair amount of time saying why, in that particular instance, that wasn't enough. That offense is not on the list of offenses that creates a presumption of depravity. But it is possible, then, that if it's on that list of offenses where there's a presumption of depravity, I realize we're talking about a different section here, that could make a difference. What I'm asking for, I fully understand, could cause my client to lose. But he's already lost. If they have something to say, say, the state agencies or the people of the state of Illinois, and it's admissible, I don't care. I take the record that comes to me. And that information, I just don't have. Mr. Rothman, you will have time for rebuttal. Ms. Lee, you may proceed. Good morning. Good morning. Stephanie Lee from the People. The People do not argue that incarceration in and of itself is actually evidence of the failure to make reasonable progress. However, it is very much a condition that will impede the progress towards reunification. And if you look at the statutory section M2 that we're talking about, that really is the most important part of that section, is progress towards reunification with the child. That's the goal. The service plan is intended to help assist with that. And obviously, again, in the Keon case, he wasn't even offered services. I believe that caseworker didn't even know where that individual was incarcerated. They didn't try to set up visits. They didn't do anything. Well, how is this much different where we have a service plan granted? Let's just assume for a minute, and you may differ with this, and actually I think you do in your brief, but assume for a minute that this defendant, this responding father, is given a service plan that has five things to do. And he does three out of five. But two of them are absolutely impossible for him to do. How is that different than Keon to then say, we haven't moved toward return home, so we're going to focus on that part of the statute as opposed to the service plan part of the statute? And ultimately, we don't control the services that DOC is going to offer an incarcerated person. Although, to the extent that you would say that they didn't do anything, I disagree with that. I think what they did is commit felonies. And actually, for the court's information, I believe in the statement of facts that was brought up at the very beginning of the case. It said that his convictions in 2013 were for aggravated battery of a person over 60 and aggravated distress of a firearm. So I believe that is what led to his incarceration. But in the end, you had a four-month-old child that had no safe parents. One parent is incarcerated, the other parent. And so that is what he did to create the situation, is he became incarcerated by committing felonies. In terms of the services that were available to him, there was also the GED, which he was offered at one point in the record, it did imply that he couldn't do that until at least four months prior to his release date. But there's no evidence that he did that. There was evidence in a report from the Children's Home that he was involved in that, and they showed some type of activity book and program book. My recollection is that he was asking they asked him to do any services that were available including vocational and GED, and he never approved and provided any proof that he did any of those things. Also, to the extent that he was going to be out at the time that was alleged at the end of the period, he could have been calling the caseworkers, set me up for parenting, I need to get my job, I need to move closer to my child instead of four hours away. No, but he didn't take the opportunity to appear at the hearing to help rebut what was the evidence, because the testimony at the hearing was actually, I sent him a list of all the services, I sent him the service plans, he signed them, he didn't appeal them, and then he failed to do any of them or show me proof of any of them. And that was the by him voluntarily absenting himself, obviously he doesn't have the burden of proof, but he certainly didn't take that opportunity to assist as a counsel in showing that, hey, wait a minute I did actually make some progress, or I did get my GED, or I did do those services that you asked me to do, or I did ask for a transfer, I did call my worker every day asking to be signed up for parenting classes and he didn't do that, he took actually no initiative really, everything was, he was brought to court, the child was brought to him. He didn't ask for a transfer, I agree that's one possibility, whether that would have happened or not, I don't know. You said that he was incarcerated for aggravated battery and egg discharge of a firearm. Was there information included there as to the date of his incarceration? The arrests for those items, it was June of 2013 it's in the Statement of Facts, which I believe is Exhibit 1 actually from the original shelter care hearing. At that point in time the child was not even born, right? Correct. And he is incarcerated and later finds out that he is the father of this child. Correct, it sounds like So it's a little different than him knowing he has a child, and hey I'm the father of this child and then I commit this offense and I go to the Department of Corrections. Correct He certainly knew he engaged in activities that might have led to a child It sounded to me from the record that he actually did know he was a parent, because when the shelter care hearing first took place he was immediately named as the father, although another man had actually put his name on the birth certificate, which is why we had to actually terminate, or he surrendered, so we actually had two fathers in this case a legal father and a biological father who later became also a legal father So I think that he did know, but he certainly knew by the time that the shelter care hearing happened and at that time he made calls he did what he could in that sense. I don't think the evidence shows that he did everything possible in DOC because the testimony at the hearing was actually that he did not show any proof of any involvement in the services there So in that sense he actually did not The fact of the matter is that under Section M the legislator has very carefully balanced the, yes, fundamental right of the parent to their children against also what is really needed is not to leave these children in limbo and it used to be a 12 month period from my recollection of the statute and it's actually been shortened to 9. Couldn't you pick any 9 month period for any incarcerated person and say they're no closer today whether they're going to get out the day after the 9 months is up or 10 years after the 9 months is up and say they're no closer today to having this child returned home? You could, actually you could because the fact of the matter is they created a condition by being incarcerated that removed them from society. So our statement in Keyhan and then this most recent Rule 23 is wrong. That incarceration alone is enough. It may be very it may be almost impossible or difficult to overcome the finding as it is with other sections. You also have a section I think it was Section G where it's all stuff that was before the child was even taken into custody and you're not even allowed to look into care and you're not even allowed to look before that that's Section G. And yes in that case too or in a case even under M, a case of a substance addicted person they may not get over that in 9 months. A person who's mentally ill might have institutionalizations or things that make it very difficult for them to overcome it. Section 1D and 2 of the Adoption Act states specifically that services required to be complied with in the service plan must be made available to the parent in order to find that he or she failed to make reasonable progress, correct? Actually I read that a little differently with all due respect. It says if there's a service plan and the services are available and they fail to comply then failure to make progress includes not completing those services. It doesn't exclude other ways of not making progress in my reading of that. And what I would say is the first part of the statute which says it's progress towards what? Towards reunification. And so how long would a child have to wait if this was a 10 year sentence, a 12 year sentence? But then you could always go on under the other section of incarceration not being able to fulfill parental responsibilities. But I mean we're talking here about a legislature made it short. But you could pick any nine month period that any person is incarcerated and whether they have a service plan, don't have a service plan, it really doesn't matter because they are just no closer. I don't think it's everybody. I think as the case law says it's sui generis and you look at each case individually. If you had a case where my example in my brief was older children who had already established a relationship, you had a parenting track record that you could see that maybe this person really could reunify with this child. Why is it that this case, because we have a case here where the nine month period ends I think in October, he gets out in November and the petition is filed in January. I mean everybody in the whole system going into court knew that this guy was going to get out in November. So you picked that nine months right before he gets out when he couldn't make progress but he can certainly make progress after that once he gets out theoretically. Actually I think that was to his advantage in this particular case. Part of the reason that it extended so long is actually because at a certain time I think the mother was making some reasonable indication that she might have been able to reunify. But by waiting until that very end period, first of all earlier on it does indicate that the GED would have been available towards the end of that time when he could have showed some initiative and been trying to get in touch with the caseworker and making sure that he was all set up to be able to be released and show progress. But the other factor is not that it comes first, but sometimes it really is under these statutory sections difficult to overcome the unfitness part. The other example I gave was Section G or maybe Section I where there is a presumption of depravity. You may be found unfit. Then you get to that second part and you can look at is this a thing we should be doing? I realize you don't do that first. You have to find them unfit. But once you get to that best interest part you also do have other options besides termination. So it's not that unfitness is per se termination. But if you fit under a statutory section and people do have discretion to choose which one to charge or allege. And if it fits it doesn't matter that there is another section that might also fit. As the case law says we only need one section proven. But I think that just because you could have charged some other section doesn't mean that this section doesn't fit this particular person as well. If we were finding the trial court error in holding that respondent failed to make reasonable progress based upon the sole fact that he was incarcerated is there another way we can affirm the trial court's decision? You can find that he didn't. Well if you found that he didn't meet the statutory section of M2 as a whole obviously then he's not unfit at this time and no. But I think you can find that it isn't just the incarceration. It was also the fact that he didn't do the other services that were available and didn't take that initiative. He did choose to put himself in an incarcerated situation in the sense that he committed felonies. You talk about him not doing the other services but let's talk about that a little bit. There was a report filed by Babcock on September 15th that said that the respondent had enrolled in the GED and he provided a program assignment history to the casework. So doesn't that show that he was involved in the GED program? Now you can't order someone to pass a test probably but you can certainly order them to get involved in the program. Wasn't there proof that he was involved in the program as of September 15th of 15th? I don't recall that. I recall initially them saying that he had inquired about it. I'm not disputing if it's in the record. Right. Earlier on he had inquired about it and was told he couldn't start until four months before his parole date. Right. But then on September 15th, at least my information is there's a report from Babcock saying that he was enrolled in it. Her testimony at the hearing was that he in fact did not show her any evidence of participating in the services there. But I think there were other services as well. There's counseling and other services that she indicated were available. Well, the counseling he testified or there was some information, maybe it was in the report, that he said that we have counselors there but it's kind of a one-shot thing. It's not like this regular counseling that we can get in and see the counselor all the time. Do you recall that? I recall him at one point, somebody saying that, you're right, earlier on that there was only there was a counselor available but it was not a regular but I don't think that. And then you would agree with the parenting classes. He did provide proof that there was no parenting classes. Correct. But I would say that at the end, especially because we were at the time that he was almost out, I believe he could have contacted his caseworker and said, hey, I'm out on November. I would like to be signed up for parenting classes at the first available opportunity and I'm ready to go. Well, there was evidence he was in touch with her all the time, correct? During that nine-month period, I believe he was in touch with her. As soon as he got out, we happened to know that he stopped. He lost touch. He doesn't contact her. He disappeared. He didn't show up to hearings. How do you take her testimony on February 10th of 16, where she said that the respondent is enrolled in everything that's available to him at this time? That was her testimony obviously not at the unfitness hearing. Her testimony at the unfitness hearing was that he did not provide proof that he had completed any services at that time. And how do you respond to the fact that at the time that the trial court decided to change the permanency review goal, DCFS, the agency, all recommended return home as the goal? I think that at that time, well, DCFS ultimately sent it for legal screening and it passed. After a trial judge says, hey, let's screen this for termination, what are they going to do? I'm talking about when they were there before the trial judge opened his mouth. He actually wasn't present at that hearing. He showed up very much at the end after the ruling had already been made when the goal was changed. I think, again, we would have had a situation where he might have been able to participate in the trial in a different fashion. That was the last hearing he even attended at all. But he did have notice then of the next dates by coming at the very end. But he, I think the trial court just said this has been too long. I can see that we're not making progress. Now we actually at that point had a, when you're talking about the goal change, you actually had a father who was not present in court. So certainly the judge is going to look at that. Because a lot more things come into the goal change than you can consider in whether he made progress in a nine-month period when you're only supposed to look at the nine-month period. When we're looking at the goal change, you look at the whole picture and the whole situation and you had a father who wasn't even in court. Thank you. Thank you. Thank you. To a great extent in legalese, this case boils down to burden of proof, burden shifting and the like and who can or has a duty to prove what. And frankly I suggest that the court always has to put themselves in the position a little bit of the prisoner and saying okay I'm a prisoner. What in the world can I do? How do I contact internally? What can be done? Because one thing everybody knows from this record I think is that DCFS does not have services that it provides within DOC. Not a surprise. But they're not available. So DOC does whatever it does on the basis of whatever its considerations are and I think we have to accept their decision on that is right. We can't be telling DOC what they have to do for giving programs for people such as my client. When you get right down to it, you've got standards of review and I am slavish personally in saying you go to the petition or the pleading, it alleges what it alleges, that's the trial. And there is no justification in my personal view for either affirming or overturning by any court, anywhere on the basis of things which aren't somewhere in the issues raised by the pleadings. And I know it's tempting and I know it gets good results sometimes but when you get right down to it, the system has to work because there's some consistency to it. Judges are judges and DCFS is DCFS and everybody has their role to play. When you get right down to it at a trial level court situation I stand on my conclusion, just before the conclusion of my initial memorandum coming from Kean about the importance, the interest of the parents in the care, custody and control of their children is the only fundamental liberty interest guaranteed by law. And it doesn't say it's constitutional, it just says it's guaranteed by law. And then the Supreme Court case in Steele somewhat longer quotation A fundamental right is involved. Parents have rights superior to others, including the state in the ruling of their child unless it is shown by clear and convincing evidence that they have forfeited one of mankind's most important rights. And then you have the people on the ground being faced with countervailing issues such as best interest of the child. Nobody wants to fight against the best interest of the child. But the law is abundantly clear and Steele says it very well. First you have to find the person to be unfit. And I suggest that that's a very hard thing for human beings to do. All judges, all lawyers, all everybody. To say we're going to isolate that in a box and we're going to find that first. But I think that's what all the law requires us, all of us, to do. And if that is, if I'm right on that, I think this has to go back. Did Babcock testify that the Respondent did not provide proof of the services? I can almost answer that but she testified more than once and I'm having a little bit of trouble. I do know I talked about having the unfitness hit the trial. I have to walk on a little bit but I do know there was some testimony from her, I thought it was earlier on but maybe not, that there was a question of whether or not he had provided evidence of having done something. And I apologize for getting maybe very much of this mixed up on the facts but I believe there was at least some testimony that he tried. Let me ask you this. During the unfitness trial, did the trial court take judicial notice of the court file and all its contents? Well since it does that 100% of the time, I assume that it did and I know that the judge can't. So if that statement was in there, he could say it. I do suggest that the big issue is probably that he was not at the last hearings but I suggest that once you finally get out of prison and a judge has been telling you continually that you can't he can't make reasonable progress if you don't make reasonable progress, you're unfit. You get that litany in your psychologies and in the record about that and in my memorandum put yourself in the place of the ethic, what in the world is he supposed to think? What's he supposed to do? And it's also in the record in my memorandum that he's living six hours away. He can't help that. This is after the nine months so I mean we're not really looking at that. Then I thank you and unless there's something else I use my time. The court thanks both attorneys for their arguments today. The case is now under advisement. We are adjourned.